ESTATE OF BRUNO BISCHOFF, DECEASED, HERBERT BISCHOFF AND ALVINA L. MARTIN, EXECUTORS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ESTATE OF BERTHA BISCHOFF, DECEASED, HERBERT BISCHOFF AND ALVINA L. MARTIN, EXECUTORS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 312–72, 1035–73.    Filed October 20, 1977.

*Charles H. Miller, Michael L. Hirschfeld, Jesse Safir,* and *Arthur L. Kimmelfield,* for the petitioners.
*Marion Westen* and *Peter Matwiczyk,* for the respondent.

FAY, *Judge:* Respondent determined a deficiency in petitioners' Federal estate taxes in docket No. 312–72 in the amount of $747,719.01 and in docket No. 1035–73 in the amount of $1,010,775.40.

Other issues having been disposed of by agreement of the parties, the issues remaining for decision are:

(1) Whether the estate tax valuation of decedents' interests in F. B. Associates and Frank Brunckhorst Co. is limited to the amount provided for and paid under the partnership restrictive buy-sell provisions in effect on the date of decedents' deaths;

(2) Whether the trust corpora of certain trusts created by decedents for the benefit of their grandchildren are includable in their gross estates under either section 2036(a)(2) or 2038(a)(1);[1]

(3) The fair market value for purposes of the Federal estate tax of decedents' partnership interests in a real estate holding company.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Bruno Bischoff and his wife, Bertha, were residents of Roslyn Heights, N. Y., when they died testate. Bruno died on August 1, 1967, and Bertha died on May 7, 1969. Herbert Bischoff[2] and Alvina Martin, Bruno's and Bertha's only children, were appointed coexecutors of their estates. At the time of the filing of the petitions in these cases, both executors resided in New York.

At their deaths Bruno and Bertha each owned interests in two limited partnerships: Frank Brunckhorst Co., a company en-

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect at the time of decedents' deaths.

[2] Herbert Bischoff died in 1973.

gaged in the wholesale distribution of processed pork products, and F. B. Associates, an investment company the assets of which consisted principally of stock in two closely held pork processing companies, Boar's Head Provisions Co., Inc. (Boar's Head), and Fred Weinkauff, Inc. (Weinkauff, Inc.), and also a portfolio of marketable securities.

Bruno's and Bertha's involvement in the pork processing business began in the 1930's when Bruno, his brother-in-law Frank Brunckhorst,[3] and Theodore Weiler organized Boar's Head and Frank Brunckhorst Co. Boar's Head conducted the pork processing activities of the business while Frank Brunckhorst Co. handled product distribution. In addition to these two companies, a third, Specsal Realty Corp. (Specsal), owned and leased to Boar's Head and Frank Brunckhorst Co. their jointly used production and distribution facility.

In the late 1940's Bruno, Frank Brunckhorst, and Theodore Weiler acquired a controlling interest in another smaller pork processing and distribution company, Weinkauff, Inc. They also acquired a controlling interest in the real estate holding company Ridgewood Provision Co., Inc. (Ridgewood), which owned the Weinkauff, Inc., plant facilities and leased those facilities to Weinkauff, Inc.

Prior to 1960, ownership of the 5,000-issued and outstanding shares of Boar's Head stock was divided among seven individuals, as follows:

| Name | Number of shares | Name | Number of shares |
|------|------|------|------|
| Frank Brunckhorst | 1,250 | Alvina Martin | 312½ |
| Bruno Bischoff | 1,250 | Barbara Brunckhorst Stravitz | 312½ |
| Theodore Weiler | 1,250 | F. Tony Brunckhorst (in trust) | 312½ |
| Herbert Bischoff | 312½ | | |

Also prior to 1960, ownership of the 100 issued and outstanding shares of Weinkauff, Inc., stock was as follows:

| Name | Number of shares | Name | Number of shares |
|------|------|------|------|
| Frank Brunckhorst | 5.2 | Alvina Martin | 4.55 |
| Lillian Brunckhorst | 5.2 | Barbara Brunckhorst Stravitz | 4.55 |
| Bruno Bischoff | 5.2 | F. Tony Brunckhorst (in trust) | 4.55 |
| Bertha Bischoff | 5.2 | Fred Weinkauff | 16 |
| Theodore Weiler | 7.8 | Fred Weinkauff, Jr | 4 |
| Renee Weiler | 5.2 | Nancy Weinkauff Humphrey | 4 |
| Herbert Bischoff | 4.55 | Henry Holste | 24 |

[3]Frank Brunckhorst was Bertha Bischoff's brother.

During 1960 this pattern of stock ownership, as well as that of Specsal and Ridgewood, underwent a change. Prior to 1960, four members of the Bischoff family (Bruno, Bertha, and their two children—Herbert Bischoff and Alvina Martin), and four members of the Brunckhorst family (Frank, Lillian, and their two children—Barbara Brunckhorst Stravitz and F. Tony Brunckhorst), had been partners in a small, private investment company which was organized as a general partnership. In 1960 these eight individuals transferred to that partnership their holdings in Boar's Head and Weinkauff, Inc., and also their holdings in Specsal and Ridgewood, the respective real estate holding companies.

As a result of these transfers of minority interests by each of the transferors, the general partnership, which was the immediate predecessor of F. B. Associates (formed the following year), acquired a 75-percent stock interest in Boar's Head and Specsal, and a 51.31-percent stock interest in Weinkauff, Inc., and Ridgewood. The shares transferred to the general partnership were valued essentially at book value. For example, the then book value of Boar's Head was $1.8 million, which was nearly 8 times average earnings over the previous 5 years. The 75-percent interest transferred by the two families was thus valued at $1.35 million, to which was applied a discount for possible liabilities, bringing the total value of the Boar's Head stock transferred by the families to $1.2 million, "which was felt to be the fair value at the time."[4]

By agreement dated August 22, 1961, the partners in the general partnership converted their partnership into a limited partnership known as F. B. Associates. Frank Brunckhorst and Bruno Bischoff, who, among the partners, were the principal operating officers of the pork processing business, became the general partners of F. B. Associates, and the remaining individuals became limited partners.

The 1961 agreement of limited partnership provided that the limited partners could sell their partnership interests or their interests in the partnership assets to members of their immediate families. This agreement was replaced in 1963 by an amended agreement of limited partnership dated as of January 1, 1963.

---

[4] Also, at this time the interest of Henry Holste in Weinkauff, Inc., was redeemed by the corporation pursuant to a restrictive shareholders' agreement. The holdings of Theodore and Renee Weiler remained unchanged.

The identity of the partners, general and limited, remained the same. However, the agreement placed an absolute prohibition upon inter vivos transfers of partnership interests, provided that partnership interests could be redeemed only by the partnership, and further provided a mandatory settlement or "buy-out" of a partner's interest upon his death at a price computed in accordance with a "formula" contained in the agreement. The formula price represented the retired partner's capital account with adjustments reflecting partnership income and withdrawals. These restrictions upon transferability were intended to accomplish two objectives. First, they were intended to maintain ownership and control of the businesses of the four corporations, of which F. B. Associates was the majority stockholder, within the Bischoff and Brunckhorst families and thereby assure their continuing ability to carry on their pork processing business without outside interference. Second, the restrictions were intended to provide continuity of management; in effect, the restrictions were to assure that the younger memebers of the Bischoff and Brunckhorst families would remain with the companies after the deaths or retirements of the older members.

On July 31, 1964, F. Tony Brunckhorst withdrew from F. B. Associates. As a result of his withdrawal, the 1963 partnership agreement was amended to provide for the retirement of the interest held in trust for him. At the same time, the capital account of the trust for the benefit of Barbara Brunckhorst Stravitz was increased by the amount of F. Tony Brunckhorst's redeemed account. Since that date, four partners, including decedents, have died.[5] The partnership interest of each of these deceased partners has been retired in accordance with the provisions of the 1963 agreement.

At his death, Bruno held a 12.5-percent interest in F. B. Associates which was retired in accordance with the agreement for $454,794.70, and at her death, Bertha held a 14.286-percent interest in F. B. Associates which was likewise retired for $342,605.35. As a result of the retirement of these interests and the interests of two other deceased partners, the total interests held by the Bischoff family in F. B. Associates have been, at various times, one-half, three-sevenths, one-third, and are now

---

[5]Frank Brunckhorst died in 1972, and Herbert Bischoff died in 1973.

one-quarter. Alvina Martin, the sole surviving Bischoff family partner in F. B. Associates, presently owns an interest that is substantially smaller than the collective interest which she and her parents, the decedents, held in 1963.

The decedents' interests in Frank Brunckhorst Co. (the partnership that distributed Boar's Head products) were held at their deaths pursuant to a limited partnership agreement, dated January 1, 1966, which superseded all prior partnership agreements. Like the 1963 F. B. Associates partnership agreement, this agreement placed an absolute prohibition upon inter vivos transfer of partnership interests (which could be redeemed only by the partnership) and provided a mandatory retirement of a partner's interest upon his or her death. The redemption or retirement price is computed in accordance with a "formula" contained in the agreement. The formula price represented the retired partners' capital account with adjustments reflecting partnership income and withdrawals. These restrictive provisions, like those in the F. B. Associates partnership agreement, were intended to exclude outsiders and assure managerial continuity. At his death, Bruno owned a 3.406-percent interest in Frank Brunckhorst Co. which was retired in accordance with the partnership agreement for $26,523.16, and at her death, Bertha owned a 3.526-percent interest in Frank Brunckhorst Co. which was likewise retired for $28,147.56.

In addition to the partnership interests in Frank Brunckhorst Co. which Bruno and Bertha owned at death, they had previously held additional interests therein which they had transferred in trust for the benefit of their grandchildren.

By agreements dated December 31, 1957, Bruno created identical trusts for the benefit of his and Bertha's four grandchildren. The corpus of each trust, when created, was 7.5 percent of Bruno's then 10-percent interest in Frank Brunckhorst Co., constituting a 0.75-percent interest in the company. The trusts were irrevocable and were to terminate upon the beneficiaries' reaching 21 years of age. The trustee of each trust was authorized to apply income and principal for the benefit of the beneficiary and to accumulate income not so applied. Bertha was named trustee of each trust, and, in the event of her death, resignation, or failure to act, Frank Brunckhorst was appointed substitute and successor trustee in each case.

On January 1, 1958, Bertha created four identical trusts for

the benefit of the same grandchildren. The corpus of each trust, when created, was 7.5 percent of Bertha's then 10-percent interest in Frank Brunckhorst Co., constituting a 0.75-percent interest in the company. The trust terms were identical to those of the trusts created by Bruno, with the exception that Bruno was named trustee of each trust. Bruno and Bertha died prior to the termination of any of the foregoing trusts.

Bruno and Bertha also owned at death partnership interests in B.B.W. Co. (B.B.W.), a real estate holding company which owned property in New York City and certain other minor investments and assets. B.B.W. was composed of members of the Bischoff, Brunckhorst, and Weiler families whose interest were held pursuant to a limited partnership agreement dated January 1, 1956, as amended by agreement dated January 1, 1962. Bruno held a 10-percent interest in B.B.W. at death, and Bertha held a 15-percent interest in B.B.W. at death. The underlying asset value of B.B.W. on August 1, 1967, Bruno's date of death, was $858,000; and the underlying asset value of B.B.W. on May 7, 1970, the anniversary of Bertha's death, was $833,000.

On the Federal estate tax returns, petitioners included in Bruno's and Bertha's respective gross estates the amounts received upon retirement of their interests in F. B. Associates and Frank Brunckhorst Co. Petitioners did not include in their respective gross estates any part of the value of the corpora of the trusts created by Bruno and Bertha for the benefit of their grandchildren. In addition, they valued Bruno's and Bertha's interests in B.B.W. at $78,796.92 and $76,700.02, respectively.

Respondent in his statutory notice determined that the restrictive buy-sell provisions in the F. B. Associates and Frank Brunckhorst Co. partnership agreements served no bona fide business purpose and as a consequence included in each decedent's gross estate an amount he determined to be the fair market value of the respective partnership interests. Respondent also determined that the corpora of the trusts created by Bruno and Bertha for the benefit of their grandchildren were includable in the gross estates of each trustee under sections 2036 and 2038. Finally respondent determined that the fair market values of Bruno's and Bertha's minority interests in B.B.W. were $86,000 and $125,000, respectively.

OPINION

The first issue for decision is whether the value of decedents' partnership interests in F. B. Associates and Frank Brunckhorst Co., for purposes of the Federal estate tax, is limited to the amount provided for and paid under the partnership buy-sell provisions in effect on the dates of decedents' deaths. In *Estate of Weil v. Commissioner*, 22 T.C. 1267, 1273, 1274 (1954), we stated:

It now seems well established that the value of property may be limited for estate tax purposes by an enforceable agreement which fixes the price to be paid therefor, and where the seller if he desires to sell during his lifetime can receive only the price fixed by the contract and at his death his estate can receive only the price theretofore agreed on. *Estate of Albert L. Salt*, 17 T.C. 92; *Lomb v. Sugden*, 82 F.2d 166; *Wilson v. Bowers*, 57 F.2d 682.

Respondent does not contend that the partnership restrictive buy-sell provisions are unenforceable nor does he contend that no lifetime and after-death transfer restrictions existed. Instead he contends that the buy-sell provisions in the F. B. Associates and Frank Brunckhorst Co. partnership agreements should be disregarded because they lacked a bona fide business purpose and were merely a substitute for a testamentary disposition to the natural objects of decedents' bounty.[6] See sec. 20.2031–2(h), Estate Tax Regs. We disagree and, in accordance with the reasoning and findings of the trial judge,[7] hold that the provisions had a business purpose and that they were not a substitute for a testamentary disposition.

Respondent first contends that the restrictive buy-sell provisions in both the F. B. Associates and the Frank Brunckhorst Co. partnership agreements should be disregarded because the maintenance of continuity of management is the only business purpose which will support a buy-sell arrangement. He argues further that since F. B. Associates and Frank Brunckhorst Co. were limited partnerships and since the limited partners did not play an active role in the business, the buy-sell provisions had no management or business rationale.

Respondent fails to cite, and we are unable to find, any support for this contention. On the contrary, the cases have held that the maintenance of family ownership and control constituted a

---

[6]Because we find valid business reasons for the buy-sell provisions, we do not reach the question whether in the absence of such reasons a genuine and binding restriction on sale can properly be ignored in determining value.

[7]Cynthia Holcomb Hall, Judge, was the trial judge in this case.

legitimate business consideration. *Estate of Reynolds v. Commissioner*, 55 T.C. 172 (1970); *Estate of Littick v. Commissioner*, 31 T.C. 181 (1958); *Baltimore National Bank v. United States*, 136 F.Supp 642 (D. Md. 1955).

The evidence presents a picture of a pork processing business organized, controlled, and managed by three families. Two of those families subsequently organized a limited partnership, F. B. Associates, and transferred their stock holdings in Boar's Head and its sister corporations to that partnership. The F. B. Associates partnership agreement was amended thereafter to provide for the mandatory retirement or redemption of a retiring or deceased partner's interest in the partnership. In addition, the Frank Brunckhorst Co. partnership agreement was similarly amended to provide for mandatory retirement or redemption of a retiring or deceased partner's interest.

We are convinced that the members of F. B. Associates and Frank Brunckhorst Co. entered into the respective partnership agreements in order to assure their continuing ability to carry on their pork processing business without outside interference, including that of a dissident limited partner. In order to accomplish this objective, restrictive buy-sell provisions were incorporated into the partnership agreements. The F. B. Associates agreement maintained ownership and control of F. B. Associates in the Bischoff and Brunckhorst families and in turn maintained ownership and control of Boar's Head and its sister corporations within those two families, and the Frank Brunckhorst Co. agreement maintained ownership and control of Frank Brunckhorst Co. in the Bischoff, Brunckhorst, and Weiler families. We therefore conclude that the buy-sell provisions were grounded on legitimate business considerations.[8]

Respondent also argues that, since F. B. Associates was merely a holding company and required no management, no "legitimate" business purpose existed for the buy-sell arrangement and that it should be disregarded. In support of his argument, respondent emphasizes that the cases in which a bona fide business purpose was found all involved the active conduct of a trade or business.

We are of the opinion that respondent's argument is artificial

---

[8]See *Estate of Weil v. Commissioner*, 22 T.C. 1267 (1954), where we found no evidence of a tax-avoidance scheme in a situation involving a limited partnership.

and strained. To maintain continuity of management and control of Boar's Head and its sister corporations required the Bischoff and Brunckhorst families to retain at least a majority of the stock in the various corporations. Since that stock was held by F. B. Associates, it was necessary to provide for a buy-sell arrangement at the partnership level in order to maintain such ownership within the two families. We therefore conclude that the fact that F. B. Associates was merely a holding company is irrelevant. Moreover, the interposition of the partnership between the two families and the operating companies should not distract our focus from the primary question of whether the buy-sell arrangement was grounded on a bona fide business purpose. Having found such a purpose for both the F. B. Associates and Frank Brunckhorst Co. partnership buy-sell provisions and since the partnership provisions provided for enforceable lifetime and after-death transfer restrictions, we conclude that the value of decedents' interests in F. B. Associates and Frank Brunckhorst Co. is the amount provided for and paid under the buy-sell provisions of the partnership agreement.

Respondent also argues that "If events ran their normal course, the four parent-partners would die leaving their interests in F. B. Associates to the four partner-children." Respondent therefore concludes that the buy-sell provisions were merely a substitute for a testamentary disposition. Such a contention has been rejected by this Court and other courts, and we find no merit in it since the provisions were equally applicable to all the partners in F. B. Associates. See *Brodrick v. Gore*, 224 F.2d 892, 896 (10th Cir. 1955); *Estate of Littick v. Commissioner, supra* at 188.[9]

Further, in 1963 when the F. B. Associates partnership agreement was amended to provide for an absolute prohibition upon inter vivos transfers of partnership interests and a mandatory buy-out of a partner's interests upon death, the

---

[9]In situations involving a unilateral agreement to sell stock in a closely held corporation, we have looked to the adequacy of the consideration at the time the agreement is entered into, rather than at the date, for valuing the property to be included in the decedent's gross estate in determining whether the agreement operates as a substitute for a testamentary disposition for less than adequate consideration. *Bensel v. Commissioner*, 36 B.T.A. 246, 253 (1937). Applying the same rationale to the facts herein we conclude that the consideration provided for in the F. B. Associates buy-sell provisions was adequate since the formula price to be paid for a partnership interest in F. B. Associates represented the fair market value of the assets of that partnership on the date those assets were transferred to the partnership, with adjustments reflecting subsequent partnership income and withdrawals.

partnership was owned equally by the Bischoff and Brunckhorst families. Subsequently, following the death of Bruno in 1967, the partnership interest held by the Bischoff family was reduced from one-half to three-sevenths. Thereafter, following the death of Bertha in 1969, the partnership interest held by the Bischoff family was again reduced to one-third. At the time of the trial herein, the interest of the Bischoff family had been reduced to one-fourth. In light of these facts, we find no basis for respondent's assertion that the F. B. Associates restrictive buy-sell provisions were merely a substitute for a testamentary disposition to the natural objects of each decedent's bounty.[10]

The second issue for decision is whether the trust corpora of certain trusts created by Bertha and Bruno for the benefit of their grandchildren are includable in their gross estates under either section 2036(a)(2)[11] or section 2038(a)(1).[12]

On December 31, 1957, Bruno created four trusts for the benefit of his and Bertha's grandchildren. He funded each trust with a 0.75-percent limited partnership interest in Frank Brunckhorst Co. and appointed Bertha trustee of each of the trusts. On January 1, 1958, Bertha created four identical trusts for the same beneficiaries and appointed Bruno trustee of these four trusts. In their respective roles as trustee, Bruno and Bertha

---

[10]Although Bertha Bischoff and Frank Brunckhorst were sister and brother, respondent does not contend that the Bischoff and Brunckhorst families were the natural objects of each other's bounty. Moreover, there is no evidence which would support such a contention.

Respondent also asserts that the partnership agreement could have been amended to circumvent the restrictive buy-sell provisions and that we should therefore ignore that provision. However, the facts have shown that the provisions were adhered to following the deaths of Bruno and Bertha Bischoff and Frank Brunckhorst and, more importantly, following the death of decedents' son, Herbert.

[11]Sec. 2036(a)(2) provides:

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

* * * * * * *

(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

[12]Sect. 2038(a)(1) provides:

(a) IN GENERAL.—The value of the gross estate shall include the value of all property—

(1) TRANSFERS AFTER JUNE 22, 1936.— To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished in contemplation of decedent's death.

had the power to accumulate trust income or to distribute trust income or corpus in their sole discretion for the benefit of the trust beneficiaries.

Sections 2036(a)(2) and 2038(a)(1) reach the value of property transferred by a decedent in which he died possessing the power to affect the enjoyment of its income.[13] It is undisputed that the powers held by Bruno and Bertha are within both sections. Thus, the sole question we must decide is whether each decedent should be treated as the "transferor" of the respective properties covered by their powers so as to require inclusion of such property in their respective gross estates.

At the outset, we note that it is clear Bruno and Bertha each nominally were not the transferors of the corpora which they trusteed. Bruno's powers extended over the property placed into trust by Bertha, and vice versa.

Respondent seeks to "uncross" these trusts, thereby making each decedent, in reality, the settlor of the trusts which, in form, were created by the other. In support of his position, he, in essence, argues the reciprocal trust doctrine as enunciated in *United States v. Estate of Grace*, 395 U.S. 316 (1969), and *Lehman v. Commissioner*, 109 F.2d 99 (2d Cir. 1940), cert. denied 310 U.S. 637 (1940).

Petitioners, on the other hand, contend that the reciprocal trust doctrine as espoused by the Supreme Court in *Grace* requires, as a condition precedent to its application, a finding that a decedent died possessing an economic interest in the property he allegedly transferred. In the present case, petitioners maintain the powers held by each decedent could not be used for their economic benefit and that fact operates as a bar to invocation of the doctrine.

Despite the excellence of petitioners' brief, we are not persuaded that the Supreme Court in *Grace* intended to delimit the doctrine's role to situations where a decedent at his death possessed an economic interest in the property transferred.

The reciprocal trust doctrine, which dates back to 1940, was formulated to deal with estate tax abuse situations where grantors created trusts that, in form, accomplished completed transfers of their property, but under which they exchanged

---

[13]Sec. 2036(a)(2), in addition, requires that the decedent have "retained" the power.

crossed gifts which might consist of a life income interest and a power to invade corpus, to change the beneficiaries, or to change the amount each would receive.[14] In reality, therefore, each grantor had the same lifetime enjoyment of his property, albeit the property was in the other grantor's trust, that he would have enjoyed had he simply reserved the same entitlements in his own trust. The doctrine was developed to deal with this situation by "uncrossing" the trusts and treating each grantor as if he had created his own trust. As a result, a decedent was treated as the "transferor" of the property, which the other party had in form transferred, causing the trust corpus to be taxed in his estate at his death. The doctrine was first expounded in *Lehman v. Commissioner, supra.* In *Lehman* the Court uncrossed trusts created by two brothers for each other's benefit on the theory that they had been made in consideration of each other. Each brother had given the other a general power to withdraw corpus with respect to the trust created for his benefit. Once the trusts were uncrossed, the decedent was found to be the transferor of the corpus of his trust and, under the predecessor of section 2038, the amount of corpus subject to his power of withdrawal was included in his estate. Thereafter, in the majority of cases where the doctrine was litigated, the issue was whether the creation of one trust had been induced by, and represented a quid pro quo for, the creation of the other.[15] Resolution of this issue produced two divergent points of view as to what set of circumstances was necessary to a finding of a quid pro quo. Both lines of cases made a factual determination as to whether the decedent had "paid for and brought about" the transfer. One line of cases decided the question by making a subjective inquiry into the decedent's motives for the transfer. See *McLain v. Jarecki*, 232 F.2d 211 (7th Cir. 1956); *Newberry's Estate v. Commissioner*, 201 F.2d 874 (3d Cir. 1953); *Tobin v. Commissioner*, 183 F.2d 919 (5th Cir. 1950), cert. denied 340 U.S. 904 (1950). The other line of cases resolved the issue of reciprocity basically by looking at the objective evidence. See *Hanauer's Estate v. Commissioner*, 149 F.2d 857 (2d Cir. 1945), cert. denied 326 U.S. 770 (1945); *Cole's*

---

[14] See S. Rept. 831, 81st Cong., 1st Sess. (1949), 1949–2 C.B. 289, 292.

[15] See, for example, *Moreno's Estate v. Commissioner*, 260 F.2d 389 (8th Cir. 1958); *McLain v. Jarecki*, 232 F.2d 211 (7th Cir. 1956); *Newberry's Estate v. Commissioner*, 201 F.2d 874 (3d Cir. 1953); *Orvis v. Higgins*, 180 F.2d 537 (2d Cir. 1950); *In re Lueders' Estate*, 164 F.2d 128 (3d Cir. 1947); *Hanauer's Estate v. Commissioner*, 149 F.2d 857 (2d Cir. 1945); *Cole's Estate v. Commissioner*, 140 F.2d 636 (8th Cir. 1944); *Estate of Lindsay v. Commissioner*, 2 T.C. 174 (1943).

*Estate v. Commissioner*, 140 F.2d 636 (8th Cir. 1944). It is this backdrop of cases that set the stage for the Supreme Court's decision in *United States v. Estate of Grace, supra.*

In *Grace* the issue was whether the test of reciprocity between two trusts should be subjective, requiring proof of an actual bargaining between the grantors to show that the trusts were created "in consideration of" each other, or whether there should be an objective test of reciprocity not requiring such proof. The Court of Claims, with two judges dissenting, was unable to find the requisite consideration under either test, even though the two trusts involved were substantially identical in terms and created as part of a single transaction at approximately the same time.

The Supreme Court reversed and determined that in the area of intrafamily transfers, the traditional concept of "consideration" as a bargained-for exchange was unrealistic. As a basis for developing a different test of reciprocity, it found the subjective intent of the decedent difficult, if not impossible, to determine. Thus, it concluded:

> For these reasons, we hold that application of the reciprocal trust doctrine is not dependent upon a finding that each trust was created as a *quid pro quo* for the other. Such a "consideration" requirement necessarily involves a difficult inquiry into the subjective intent of the settlors. Nor do we think it necessary to prove the existence of a tax-avoidance motive. As we have said above, standards of this sort, which rely on subjective factors, are rarely workable under the federal estate tax laws. Rather, we hold that application of the reciprocal trust doctrine requires only that the trusts be interrelated, and that the arrangement, to the extent of mutual value, leave the settlors in approximately the same economic position as they would have been in had they created trusts naming themselves as life beneficiaries. [*United States v. Estate of Grace*, 395 U.S. at 324. Fn. ref. ommitted.]

Petitioners contend that the Court in its usage of the words "leaves the settlors in approximately the same economic position as they would have been in had they created trusts naming themselves as life beneficiaries" meant to limit the application of the doctrine to situations where there exists the crossing of substantial economic interests and not where there are merely crossed powers. In support of their theory, petitioners make much of the fact that every one of the cases where the reciprocal arrangements were challenged involved the crossing between grantors of very substantial economic interest.

We simply cannot agree. First of all, petitioners' theory

demonstrates a basic misconception of the doctrine's function. The purpose of the doctrine is merely to identify the transferor of property. Standing alone, its application does not impose a tax; rather, the incidence of taxation depends upon the operation of a Code section when the shroud of form is lifted and the true transferor revealed. In other words, the doctrine's application is only part of a two-step process of taxation, i.e., it is not enough merely to "uncross" the trusts, there must also exist a basis for their taxation. In *Grace* the two trusts were uncrossed because they were "interrelated" *and not*, as petitioners urge, because the decedent therein held a direct economic interest in the property. The basis of taxation which led to the inclusion of the value of the trust corpus in the decedent's estate was crossed life estates under section 811(c)(1)(B)(i) of the 1939 Internal Revenue Code (the predecessor of section 2036(a)(1)). Thus, in our opinion, the Court's reference to the "same economic position * * * as life beneficiaries" was merely its formulation of the basis of taxation on the facts before it.[16]

Secondly, petitioners' contention that the sine qua non to the doctrine's application is crossed economic interests overlooks the fact that the case before the Supreme Court in *Grace*, as previously noted, involved section 811(c)(1)(B)(i). That section covered situations where the decedent retained "the possession or enjoyment of, or the right to the income from" transferred property—concepts clearly associated with a direct economic benefit. Because *Grace* involved crossed life estates and, consequently, fell within the reach of section 811(c)(1)(B)(i), any reference in the Supreme Court's opinion to retained economic interests cannot properly be interpreted to mean anything more than its expression of what would be necessary to a finding of taxation under that section. In short, adoption of petitioners' interpretation of *Grace* would be tantamount to ignoring the fact that Congress has decided that the power to use property for one's own personal benefit will not be the only basis for taxation under sections 2036 and 2038. Indeed, the mere power to affect

---

[16]Indeed, petitioners' theory of the necessity of a retained economic interest is irrelevant at best and misleading at worst. First of all, it cannot be said that one is enriched when one relinquishes fee simple ownership for a life estate. This means other motives—predominately ones of tax avoidance—control the situation and what becomes important, in these cases, is the fact that the decedent retained *something*. Moreover, were the level of "economic" retention a relevant factor, as petitioners contend, it could not be denied that a power to control the "purse strings" in many an instance would be just as gratifying as a retained life estate.

the timing of the enjoyment of property is sufficient to attract a tax under sections 2036(a)(2) and 2038(a)(1). *United States v. O'Malley*, 383 U.S. 627 (1966); *Lober v. United States*, 346 U.S. 335 (1953). We simply are not convinced that the Supreme Court intended to close a perceived loophole under section 2036(a)(1) and, at the same time, permit one to flourish under sections 2036(a)(2) and 2038(a)(1).[17]

Finally, petitioners cite a myriad of pre-*Grace* cases in support of their position that crossed economic interests are a prerequisite to the doctrine's application. While we recognize that all but perhaps one of the cited cases dealt with the crossing of substantial economic interests, petitioners are unable to refer us to any case where application of the doctrine in a situation like the present one involving crossed powers has been rejected. Furthermore, the cases cited were primarily concerned with, and turned upon the necessity of, the requirement of a quid pro quo. Thus, we find the cases cited by petitioners to be unhelpful in determining the applicability of the doctrine to the facts before us.

Moreover, this Court rejected an argument similar to petitioners' in *Estate of Newberry v. Commissioner*, 17 T.C. 597 (1951), revd. on other grounds 201 F.2d 874 (3d Cir. 1953). That case was subsequently reversed by the Third Circuit on the grounds that there was no quid pro quo for the transfer—an issue that the Supreme Court in *Grace* later held was no longer necessary to decide. In support of our opinion in *Newberry*, we quoted with approval language from *Wieboldt v. Commissioner*, 5 T.C. 946 (1945), as follows:

The significant factor is that each settlor gave the other the right to alter, amend, or terminate the trust. Such power, though not exercisable for the

---

[17]We have considered the argument that because the trusts were completed gifts under which the donors retained no economic benefit and, that because each trust considered alone would not be includable in the gross estate of either decedent, the result should dictate a judicial reluctance in applying the doctrine. While it is true each trust viewed in isolation would not fall within either sec. 2036(a)(2) or sec. 2038(a)(1), we are not sure that fact has any relevance at all. Undoubtedly, the taxpayers in *Lehman v. Commissioner*, 109 F.2d 99 (2d Cir. 1940), cert. denied 310 U.S. 637 (1940), argued the same theory to no avail. Likewise, the fact that the transfers in trust before us were completed gifts for gift tax purposes would seem to make little difference. For example, assume A sets up an irrevocable trust to pay or accumulate the income to B in A's sole discretion until B reaches age 21, at which time any accumulated income and corpus would be distributed to B. Upon the creation of the trust, A would have made a completed gift. See sec. 25.2511–2(d), Gift Tax Regs. However, should A die before B attains the age of 21, the entire trust would be includable in his estate. See sec. 20.2038–1(a), Estate Tax Regs.; *United States v. O'Malley*, 383 U.S. 627 (1966). Of course, A's estate would be allowed a credit in accordance with sec. 2012 against its estate taxes for any gift taxes paid by A.

benefit of the grantor, otherwise seems to be a general one. However, it is argued by petitioners that it was exercisable only in a fiduciary capacity and not to the advantage or benefit of the holder. Even if this be so, it remains that the power did carry with it, at least, the right to increase or diminish the beneficial interests of the respective named beneficiaries. As a matter of fact, the respective indentures were altered in that respect. If either grantor had retained such power, along with the right to direct the trustee with respect to the sale, retention, or reinvestment of trust property, although as a trustee, he would have been subject to tax on the income under *Stockstrom v. Commissioner*, 148 Fed. (2d) 491. Certainly the effect of that case may not be circumvented by a simple expedient on the part of a husband and wife of exchanging the rights with each other.

While it may be true that neither petitioner had any beneficial interest in either of the trusts and that each of them was motivated to create a trust by a desire to provide for his (her) children, the power and control over the distribution of income and principal and the power to direct the management of the trust properties, although lost to each under his own indenture, were regained under the indenture of the other. In the circumstances of this case, it might well be that such rights were the most satisfying ones to the petitioners. Certainly they are among the important attributes of property ownership. [*Estate of Newberry v.Commissioner*, 17 T.C. at 605.]

We see nothing in *Grace* which leads us to believe this aspect of our decision in *Newberry* lacks vitality.[18]

The facts in this case clearly indicate that the trusts created by Bruno and Bertha were interrelated. All that remains is finding a basis of taxation. Here the powers involved are within those forbidden by sections 2036(a)(2) and 2038(a)(1). Accordingly, we hold that the value of the trust corpora of the trusts created by Bruno and Bertha is includable in their respective estates.

The final issue for decision is the fair market value for estate tax purposes of Bruno's and Bertha's limited partnership interests in B.B.W., a real estate holding company. Petitioners concede the correctness of the computation by respondent's expert of the asset value of B.B.W.'s holdings. However, they assert that the expert erred in failing to apply *any* discount in determining the values of decedents' minority interests in B.B.W. and contend that we should utilize a 25-percent minority discount factor. Respondent, on the other hand, contends that no

---

[18]It might be argued that *Estate of Newberry v. Commissioner*, 17 T.C. 597 (1951), is distinguishable from the present case because in that case the decedent was given a power to change beneficiaries, whereas the powers here only permitted the decedents to affect the timing of the enjoyment of the income. However, the distinction is without merit. Once a power crosses the threshold of those forbidden by secs. 2036(a)(2) and 2038 (a)(1), as is the case here, the extensiveness of that power thereafter becomes irrelevant.

discount is appropriate because B.B.W. was "similar to a real estate syndicate whose fractional interests are traded at investment value."

Respondent's expert in his report stated:

No [minority interest] discount is applied because [B.B.W.] and the [interests] therein are in the domain of real estate syndicate operations where a partnership interest is traded at its fractional part of the total investment value.

Petitioners' expert witness disagreed with this conclusion, and petitioners cite *Estate of de Guebriant v. Commissioner*, 14 T.C. 611, 619 (1950), for the proposition that a minority discount is appropriate in valuing a limited partnership interest in a real estate holding company, and in accordance with the findings and conclusions of the trial judge, we agree. First, respondent's expert failed to take into account the fact that unless provided otherwise in the partnership agreement or by reason of a court decree, a limited partner cannot compel dissolution and liquidation of a limited partnership. N.Y. Partnership Law secs. 99, 63, and 108 (McKinney 1948). A limited partner merely has the right to require a return of his contribution to the limited partnership. N.Y. Partnership Law sec. 105 (McKinney 1948). Moreover, a limited partner generally has no voice in the management of the partnership and cannot control investment policies or partnership distribution. See N.Y. Partnership Law secs. 98 and 99 (McKinney 1948). In view of the existence of such restrictions on a limited partnership interest, we conclude that a minority interest in a limited partnership is sufficiently similar to a minority interest in a corporation to require the application, in otherwise appropriate cases, of a minority discount factor in determining the fair market value of such an interest. We conclude that on the present facts respondent erred in failing to apply a minority discount in determining the fair market value of Bruno's and Bertha's limited partnership interests in B.B.W., and, viewing all the surrounding circumstances, we conclude that a 15-percent minority discount factor should be utilized in

determining the fair market values of Bruno's and Bertha's limited partnership interests in B.B.W.

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

TANNENWALD, *J.*, concurring: While I agree with the result reached herein, I am concerned that the majority opinion may be interpreted as applying *United States v. Estate of Grace*, 395 U.S. 316 (1969), beyond its intended scope. By the same token, I disagree with the narrow interpretation accorded to *Grace* by Judge Hall in her dissent.

In its opinion in *Grace*, the Supreme Court stated that the reciprocal trust doctrine does not depend upon a finding of a quid pro quo and that all that is required is an interrelationship between the trusts which leaves the settlor in the same economic position.

I read *Grace* neither to lay down a rule (as Judge Hall suggests) that, even where there is an interrelationship, the absence of an economic interest in the settlor precludes the use of that doctrine, nor to imply (as the majority opinion may be read to do) that the mere simultaneity of the establishment of the trusts is enough to produce the necessary interrelationship.

In short, I read *Grace* to require a determination that the trusts were in fact interrelated. Thus, in instances where it is demonstrated that the trusts were established independently, the reciprocal trust doctrine would be inapplicable whether or not there was an economic interest in the settlor. *Estate of Grace v. United States*, 393 F.2d 939 (Ct. Cl. 1968) (Davis, *J.*, dissenting). See also Note, *"United States v. Estate of Grace:* The Reincarnation of the Reciprocal Trust Doctrine," 17 U.C.L.A. L. Rev. 436 (1969). Such objective factors as a significant separation of time in the establishment of the trusts, the occurrence of intervening events, differing amounts placed in the trusts, or differing powers granted to each trustee may indicate that the trusts were created independently.

I believe that this interpretation is a reasonable one, founded in both logic and a knowledge of human affairs. It is also

consistent with footnote 10 of the opinion in *Grace* (see 395 U.S. at 324), which provides:

> We do not mean to say that the existence of "consideration," in the traditional legal sense of a bargained-for exchange, can never be relevant. In certain cases, inquiries into the settlor's reasons for creating the trusts may be helpful in establishing the requisite link between the two trusts. We only hold that a finding of bargained-for consideration is not necessary to establish reciprocity.

Under the circumstances of this case, I would hold that the reciprocal trust doctrine should apply. The only evidence of record herein is that the trusts were established at or about the same time. Such being the case, it cannot be said that the petitioners have carried their burden of proof that each trust was not bargained for by the establishment of the other trust.

STERRETT and WILES, *JJ.*, agree with this concurring opinion.

HALL, *J.*, dissenting in part: In every one of the cases in which the reciprocal trust doctrine has ultimately been applied, including *United States v. Estate of Grace*, 395 U.S. 316 (1969), the arrangements that were challenged involved the crossing between grantors of very substantial economic interests. All but one of the cases involved the exchange of life estates or beneficial powers exercisable by the holders for their own benefit.[1] The one exception, a decision of this Court, subsequently reversed by the Court of Appeals for the Third Circuit, involved the exchange of significant powers to shift economic interests as between beneficiaries, i.e., a spray power. *Estate of Newberry v. Commissioner*, 17 T.C. 597 (1951), revd. 201 F.2d 874 (3d Cir. 1953). However, even if our holding in *Newberry's Estate* could have survived the Third Circuit reversal, it could not

---

[1] *Estate of Lindsay v. Commissioner*, 2 T.C. 174 (1943) (life estates); *Cole's Estate v. Commissioner*, 140 F.2d 636 (8th Cir. 1944) (life estates); *Estate of Oliver v. Commissioner*, 3 T.C.M. 408, 13 P-H Memo. T.C. par. 44,138 (1944) (life estates); *Hanauer's Estate v. Commissioner*, 149 F.2d 857 (2d Cir. 1945) (life estates and power to amend); *Orvis v. Higgins*, 180 F.2d 537 (2d Cir. 1950) (life estates); *McLain v. Jarecki*, 232 F.2d 211 (7th Cir. 1956) (life estates); *Moreno's Estate v. Commissioner*, 260 F.2d 389 (8th Cir. 1958) (life estates); *Estate of Carter v. Commissioner*, 31 T.C. 1148 (1959) (life estates); *United States v. Estate of Grace*, 395 U.S. 316 (1969) (life estates and power to change beneficial interests); *Lehman v. Commissioner*, 109 F.2d 99 (2d Cir. 1940) (power to withdraw corpus); *In re Lueders' Estate*, 164 F.2d 128 (3d Cir. 1947) (life estates and power to withdran corpus). Cf. *Krause v. Commissioner*, 57 T.C. 890 (1972), affd. 497 F.2d 1109 (6th Cir. 1974) (grantor trust provisions applied for income tax purposes where spouses granted to trustees reciprocal powers to accumulate and pay over income and corpus to each other).

survive the enunciation of the retained economic benefit test by the Supreme Court in *Grace.*

Applying the *Grace* approach to the present case, it seems clear that powers to use principal and interest for minor grandchildren's needs, deemed by respondent to be exchanged by Bruno and Bertha, were not powers having "economic value" to the decedents. The majority, in applying *Grace,* in effect, reads the word "economic" out of the Supreme Court's formulation, saying it was not essential to the principle of the case. Certainly these trusts did not reflect the thinly disguised retention of an "economic interest" which the Supreme Court found determinative. Rather, in each case, the settlor made a completed gift in trust of his or her own property to their minor grandchildren, the natural objects of their bounty, not retaining any power which would include the corpus of the trusts in the settlor's estate. The trust conferred economic interests only on the beneficiary; they conferred no economic interest on the trustee whose only power was to accelerate the receipt of the economic interest by the beneficiary during his minority. Not even a "spray" power was retained, so that the "retention" on uncrossing the trusts fell short of even the retention in *Newberry's Estate,* the previous high water mark of this Court's application of the reciprocal trust doctrine. Neither settlor would have been economically worse off had the other not elected to make a concurrent gift to the objects of his natural bounty. It is therefore also most difficult to perceive the "interrelation" between the trusts called for in *Estate of Grace.* In my view, they were concurrent and similar, but not interrelated in any meaningful sense. Had the property in question all happened to belong to one grandparent, there is no reason to believe that grandparent would not have wished to put it in trust, naming the other as trustee, and there would be no question of includability. I see insufficient reason why essentially the same result cannot properly be achieved where each grandparent happens to own part of the property sought to be entrusted. This is not the kind of situation the reciprocal trust doctrine was intended to cover or, at least since *Grace,* ever has been extended to cover. I recognize the majority's argument that Congress has decided the question of retained powers which suffice for includability and that indirect retention of the equivalent of such powers through reciprocal arrangements should produce the same result. However, I

believe this would carry a good and necessary principle too far—certainly further than the language of *Grace* would warrant. I conclude that such an extension of the doctrine is unwarranted under these circumstances. While it is true that each settlor gave the other powers, retention of which would have frustrated the estate plan, Congress permits a grantor, and it is common planning, to put such powers in the hands of one's spouse. The mere fact that both spouses had similar property and one spouse concurrently does the same with his or her own trusts does not improve the economic position of the power-holding spouse or make the other spouse the "transferor." Congress chose to allow the entrusting to a spouse of the power to accumulate trust income or to distribute trust income or corpus, which power could not be retained personally. It seems to me that until Congress provides to the contrary, it is not for us to say that where spouses happen to own similar property they are barred from each doing concurrently what either could safely do alone. Unlike the cases of illusory relinquishment of economic interests where the reciprocal trust doctrine has been applied, there has here been the real relinquishment of economic value which the statute contemplates for exclusion from the estate.

DRENNEN, SCOTT, and GOFFE, *JJ.*, agree with this dissenting opinion.