T.C. Memo. 1998-365

UNITED STATES TAX COURT

ESTATE OF ANN H. BROOKSHIRE, DECEASED, HARVEY B. KING,
INDEPENDENT EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9804-96.                    Filed October 8, 1998.

William R. Cousins III, Robert Don Collier, and Robert M. Bolton, for petitioner.

Donna Mayfield Palmer, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, Judge: Respondent determined a deficiency of $3,509,857 in the Federal estate tax of the Estate of decedent Ann H. Brookshire.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of November 20, 1993, the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After settlement, the issue remaining for decision is the value, as of the date of decedent's death, of 106,826 shares of common stock of a closely held family corporation.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time of decedent's death, decedent resided in Tyler, Texas, and at the time the petition was filed, the executor, Harvey B. King, resided in Tyler, Texas.

Upon her death, decedent owned directly 60,743 shares or 2.71 percent, and indirectly through a family trust 158,967 shares or 7.08 percent, of the common stock of Brookshire Grocery Co. (Brookshire). Decedent's stock interest in Brookshire represented a total of 219,710 shares or 9.79 percent of the total 2,243,727 shares outstanding.

Brookshire was founded by Wood T. Brookshire in the 1920's and was incorporated in Texas in 1953. Brookshire owned and operated a chain of 96 retail grocery stores located primarily in rural communities in Texas, Louisiana, and Arkansas.

Brookshire common stock is closely held by relatives of Wood T. Brookshire, by current and former employees of Brookshire and

their relatives, and by an employee profit-sharing plan.  The stock is not listed on any stock exchange and is not traded over the counter.

More specifically with regard to the ownership of Brookshire common stock, on the date of decedent's death, Brookshire common stock was owned by two groups of shareholders:  66 percent was owned by relatives of Wood T. Brookshire; and 34 percent was owned by 200 current and former employees of Brookshire and their relatives and by an employee profit-sharing plan.

Under longstanding buy-sell agreements to which all shareholders in Brookshire were subject, Brookshire had a right of first refusal or a right to purchase any Brookshire common stock that any shareholder proposed to sell or transfer.  The price at which Brookshire could purchase shares of Brookshire common stock under the buy-sell agreements (hereinafter referred to as the formula price) was set at the lesser of book value or the proposed per-share purchase price reflected by the proposed sale or transfer.

However, on October 4, 1988, decedent and Brookshire entered into a stock-purchase agreement under which it was provided that, after decedent's death and at the option of decedent's estate, Brookshire was obligated to purchase from decedent's estate the Brookshire common stock owned by the estate.  As indicated, Brookshire's obligation under the stock-purchase agreement to

purchase decedent's common stock in Brookshire was triggered only if decedent's estate exercised the option to sell the stock, and Brookshire's purchase obligation was limited to the number of shares that (under the same book-value-based formula as set forth in the buy-sell agreements) would reflect a total purchase price of no more than $7,844,233. This amount corresponded with the total amount of life insurance that Brookshire carried on the life of decedent.

The purpose of the stock-purchase agreement was to ensure that decedent's estate would have funds available to pay Federal estate and State inheritance taxes relating to the Brookshire common stock owned by decedent's estate.

Under similar stock-purchase agreements entered into with a number of other members of the Brookshire family, Brookshire also was obligated, upon their death, to purchase from their estates the number of shares of Brookshire common stock that corresponded to the amount of life insurance Brookshire carried on their respective lives.

On the date of decedent's death, in addition to a chain of grocery stores, Brookshire owned the following: (1) Two food and merchandise distribution centers that supplied approximately 80 percent of the products sold in Brookshire stores; (2) two bakery plants; (3) a milk processing plant; and (4) a photo processing center.

By the fall of 1993, Brookshire stores were experiencing increased competition from Wal-Mart SuperCenters that were being opened within the same geographic markets in which Brookshire stores were located.  In 1992, a Wal-Mart SuperCenter opened in Mount Pleasant, Texas, in direct competition with two Brookshire stores, apparently the cause in a drop of current sales of those two Brookshire stores by 20 to 30 percent.

In 1993, prior to decedent's death, four additional Wal-Mart SuperCenters opened in direct competition with Brookshire stores, apparently the cause in a drop of current sales of those Brookshire stores by 20 to 40 percent.

In early fall of 1993, Wal-Mart announced the opening in 1994 of four or five additional SuperCenters, and Wal-Mart had plans to open approximately 15 additional Wal-Mart SuperCenters in the near future in the same markets as those in which Brookshire stores were located.

To be competitive with the Wal-Mart SuperCenters that were being opened in its markets, Brookshire would be required to make large capital expenditures to refurbish old grocery stores and to construct new stores.

For its fiscal year ending September 28, 1993, Brookshire's net sales from its grocery stores and other business activities was approximately $1.12 billion.

For at least each of the 10 years prior to decedent's death, Brookshire paid cash dividends to its shareholders.

On November 20, 1993, the date of decedent's death -- based on an approximate total book value for Brookshire of $164,764,000 -- the per-share formula price under the buy-sell and stock-purchase agreements for the shares of Brookshire common stock owned by decedent's estate was $73.43 per share.

Prior to decedent's death, no blocks of Brookshire common stock anywhere near as large as decedent's block of 219,710 shares had been sold. In fact, in the 3 years prior to decedent's death, the largest block of Brookshire common stock that had been sold consisted of 6,111 shares. Prior to decedent's date of death, it appears that each sale of Brookshire stock constituted a non-arm's-length sale.

On August 22, 1994, decedent's estate sold 29,410 shares of Brookshire common stock back to Brookshire for $79.50 per share in order to provide cash to the estate for payment of decedent's reported estate tax liability.

On August 23, 1994, petitioner timely filed decedent's Federal estate tax return. Based on an appraisal, the total value of the 219,710 shares of Brookshire common stock owned directly and indirectly by decedent's estate was reported on the estate tax return at $12,907,962 or $58.75 per share.

On audit, based solely on the book-value-based formula set forth in the stock-purchase agreement, respondent determined that, on the date of decedent's death, the total value of 106,826 shares of Brookshire common stock (consisting of the 60,743 shares owned directly by decedent's estate and 46,083 of the 158,967 shares owned indirectly by decedent's estate) was $7,844,233 or $73.43 per share. Respondent accepted the $58.75 per-share value of the remaining 112,884 shares of Brookshire common stock owned indirectly by decedent's estate as reported on decedent's Federal estate tax return (for a value of $6,631,935). Respondent determined the total value of all of the shares of Brookshire common stock owned by decedent's estate to be $14,476,168.

In a report exchanged a few weeks before the trial herein, respondent's expert opined that the value of the shares of Brookshire common stock owned by decedent's estate was $89.14 per share or a total value for all shares of $19,584,950, representing an increase of $5,108,782 over the value determined by respondent in the notice of deficiency.

At the conclusion of the trial and based on the increase to $89.14 per share that was reflected in respondent's expert's report, respondent orally moved to amend the answer herein to increase the deficiency in an unspecified amount reflecting the total revised value of the Brookshire common stock owned by

decedent's estate on the date of death, or alternatively, just the revised value of 106,826 shares of Brookshire common stock subject to the stock-purchase agreement.

On the grounds of timeliness and prejudice, petitioner objects to any increase in respondent's proposed deficiency. We regard as patently prejudicial respondent's attempt, at trial, to increase the value of the Brookshire common stock owned by decedent's estate by $5,108,782 or by $1,678,237, and we shall deny respondent's motion.

OPINION

For Federal estate tax purposes, property is generally included in a decedent's gross estate at its fair market value on the date of decedent's death. Sec. 2031(a); sec. 20.2031-1(b), Estate Tax Regs. Fair market value is defined generally as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973); Rushton v. Commissioner, 498 F.2d 88, 89-90 (5th Cir. 1974), affg. 60 T.C. 272 (1973); Estate of Gilford v. Commissioner, 88 T.C. 38, 48 (1987); sec. 20.2031-1(b), Estate Tax Regs.

Fair market value involves a question of fact. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982).

Arm's-length sales of stock in the normal course of business within a reasonable time before or after the relevant valuation date represent the best criteria of fair market value. Estate of Andrews v. Commissioner, supra at 940. In the absence, however, of arm's-length sales, the value of unlisted and closely held stock often is based on the value of listed stock of corporations engaged in similar lines of business. Sec. 2031(b); Estate of Hall v. Commissioner, 92 T.C. 312, 336 (1989).

Additional factors that are relevant in valuing shares of stock in closely held corporations are the following:

(1) The general economic outlook and the condition and outlook of the specific industry involved in the valuation;

(2) The book value of the stock and the financial condition of the corporation;

(3) The earning and dividend-paying capacity of the corporation;

(4) Whether or not the corporation has goodwill or other intangible value;

(5) The corporation's net worth; and

(6) Non-arm's-length sales of the stock and the size of the block of stock to be valued.

See Estate of Newhouse v. Commissioner, supra at 217-218; sec. 20.2031-2(f)(2), Estate Tax Regs.; Rev. Rul. 59-60, 1959-1 C.B. 237, 238-239.

Generally, only facts reasonably known on the valuation date provide a basis for the valuation. Estate of Newhouse v. Commissioner, supra at 218.

In valuing closely held stock, discounts are often warranted to reflect the stock's lack of marketability and limitations on transferability. Estate of Newhouse v. Commissioner, supra at 249; Estate of Andrews v. Commissioner, supra at 953.

The fair market value of closely held stock may be controlled for estate tax purposes by an enforceable agreement that fixes the price at which the stock can be sold during a taxpayer's lifetime and upon the decedent's death. Estate of Bischoff v. Commissioner, 69 T.C. 32, 39 (1977); Estate of Reynolds v. Commissioner, 55 T.C. 172, 188-189 (1970); Estate of Obering v. Commissioner, T.C. Memo. 1984-407; sec. 20.2031-2(h), Estate Tax Regs.

Under the buy-sell and stock-purchase agreements involved in this case, if Brookshire failed to exercise its rights under the buy-sell agreements, neither decedent nor her estate was prohibited from selling the stock at a price lower or higher than the formula price. We conclude, and the parties do not dispute, that for Federal estate valuation purposes, the formula price set forth in the buy-sell and stock-purchase agreements does not control the value of the stock.

In determining the fair market value of decedent's 219,710 shares of Brookshire common stock (representing 9.79 percent of all outstanding shares of Brookshire common stock), petitioner's two experts and respondent's expert agree that a discount is appropriate to reflect the lack of marketability of the stock. They disagree, however, as to the amount thereof.

Because petitioner and respondent's notice of deficiency utilize the same $58.75 per-share value for the 112,884 shares of Brookshire common stock that are not subject to the stock-purchase agreement, we need only address the valuation of the 106,826 shares of Brookshire common stock that are subject to the stock-purchase agreement.

Petitioner's first expert values the 106,826 shares of Brookshire common stock subject to the stock-purchase agreement at $6,302,734 or $59.00 per share. Petitioner's first expert utilized: (1) The guideline company method, comparing Brookshire's revenue, net income, earnings, cash-flow, and book value with those of similarly sized, publicly traded corporations operating grocery stores; (2) the discounted cash-flow method, calculating the net present value and future earnings of Brookshire and the return on investment using a 9-percent rate of return; and (3) the capitalization of dividends method, using a 2-percent yield rate. Petitioner's first expert also applied a

discount of 45 percent to reflect the lack of marketability of the stock.

Petitioner's second expert values the 106,826 shares of Brookshire common stock subject to the stock-purchase agreement at $5,237,679 or $49.03 per share. Petitioner's second expert utilized: (1) The guideline company method, comparing Brookshire's net income, earnings, and cash-flow with those of similarly sized, publicly traded corporations operating grocery stores; (2) the discounted cash-flow method, calculating the net present value and future earnings of Brookshire and the return on investment using an 11-percent rate of return; and (3) the transaction method, comparing actual sales of stock within a reasonable time before or after the valuation date and applying a 20-percent blockage discount because there were no other blocks of stock similar in size to decedent's block of stock sold within several years of the valuation date. Petitioner's second expert also applied a discount of 40 percent to reflect the lack of marketability of the stock.

Respondent's expert values the 106,826 shares of Brookshire common stock subject to the stock-purchase agreement at $9,522,470 or $89.14 per share. Respondent's expert utilized: (1) The guideline company method, comparing Brookshire's revenue, earnings, cash-flow, and book value with those of similarly sized, publicly traded corporations operating grocery stores; (2)

the discounted cash-flow method, calculating the net present value and future earnings of Brookshire and the return on investment using a 9-percent rate of return; (3) the capitalization of dividends method, using a 1.8-percent yield rate; and (4) the capitalization of earnings method, using a 7-percent current-year capitalization rate. Respondent's expert also applied a discount of 34 percent to reflect the lack of marketability of the stock.

Respondent's expert overstates the value of the Brookshire common stock because of his use of three companies as comparable companies that have significant sales in markets other than retail grocery and that are not comparable to Brookshire. The use of these companies distorts each of the valuation methods used by respondent's expert.

Respondent's expert also overstates the value of Brookshire common stock because he does not take into account Brookshire's loss of profits apparently caused by increased competition from Wal-Mart SuperCenters.

Petitioner's second expert relies on the sale of small blocks of Brookshire common stock that occurred in years prior to decedent's date of death and that constituted non-arm's-length sales.

In analyzing the economic outlook as of the date of decedent's death, petitioner's experts properly considered not

only the national economy, but also the specific economies of the geographic region in which Brookshire operated its stores.

In selecting earnings multiples, petitioner's first expert properly considered the increased competition from Wal-Mart and the decrease in Brookshire's net income for Brookshire's fiscal year ending September 28, 1993.

For the reasons stated, we agree with petitioner's first expert witness that, before applying any discount, the date-of-death value of decedent's 106,826 shares of Brookshire stock equals $11,493,409 or $107.59 per share.

With regard to the discount for lack of marketability, the parties' three expert witnesses rely on various market studies which indicate that discounts for lack of marketability often fall in a range of 23 to 45 percent with an average of approximately 35 percent for the restricted stock of a publicly traded company.

It is clear that decedent's block of 106,826 shares was not readily marketable and that any hypothetical purchaser would demand a significant discount to account for that fact.

Certainly, the consistent history of Brookshire's strong current financial position and liquidity as well as the quality management would make Brookshire an attractive investment.  There still existed, however, no public market in which to sell the

stock, and transfer of the stock would be subject to the restrictive buy-sell and stock-purchase agreements.

We conclude that the appropriate discount to use to reflect the lack of marketability of decedent's 106,826 shares of Brookshire common stock equals 40 percent. This discount is supported by the lack of a ready market on which to sell the stock, the restrictive buy-sell agreements, the lack of transactions involving large blocks of stock similar in size to decedent's shares of Brookshire stock, and the fact that decedent's stock reflects a minority interest.

Applying the 40-percent discount to the $11,493,409 pre-discounted value of the stock, we conclude that the value of decedent's 106,826 shares of Brookshire common stock on November 20, 1993, is $64.55 per share or a total fair market value of $6,895,618.

To reflect the foregoing,

An appropriate order will be issued, and decision will be entered under Rule 155.